AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No.  26-mj-8086-BER |
| NIKA MACHUTADZE, | ) |
| | ) |
| | ) |

_____
*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   November 21, 2024 and December 5, 2025   in the county of   Palm Beach   in the

   Southern   District of   Florida   , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18 U.S.C. § 1956(h) | Conspiracy to commit money laundering |

> FILED BY____*TM*____D.C.
>
> *Jan 30, 2026*
>
> ANGELA E. NOBLE
> CLERK U.S. DIST. CT.
> S. D. OF FLA. - WPB

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Nain Nayor, OPM-OIG Special Agent
_____
*Printed name and title*

Sworn to and attested to me by applicant by telephone (Facetime) per the requirements of Fed. R. Crim. P.4 (d) and 4.1.

Bruce Reinhart

Digitally signed by Bruce Reinhart
Date: 2026.01.30 12:32:55 -05'00'

Date: _____

_____
*Judge's signature*

City and state:    West Palm Beach, FL

Bruce E. Reinhart, U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Nain Nayor, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1.     I make this Affidavit in support of a criminal complaint charging Nika Machutadze ("MACHUTADZE") with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h).

2.     I am a Special Agent with the United States Office of Personnel Management, Office of Inspector General ("OPM-OIG"). I have been a Special Agent with OPM-OIG since April 2022. I have completed the Criminal Investigator Training Program and the Internet Investigations Training Program at the Federal Law Enforcement Training Center. Prior to joining OPM-OIG, I was a Legal Administrative Specialist with the U.S. Attorney's Office in the Southern District of Florida, where I was tasked with assisting in civil and criminal investigations involving health care matters. In my capacity as a Special Agent with OPM-OIG, I routinely investigate criminal, civil, and administrative violations related to health care fraud committed by health care providers. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code, that is, an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses enumerated in Title 18 of the United States Code, including, but not limited to, offenses involving health care fraud, money laundering, and conspiracies to commit those offenses.

3.     This case is being investigated by OPM-OIG, the Department of Health and Human Services, Office of the Inspector General ("HHS-OIG"), and the Federal Bureau of Investigation ("FBI").

4.      This Affidavit is submitted in support of a criminal complaint and arrest warrant. For the reasons set forth below, I respectfully submit that this affidavit contains probable cause to believe that between on or about November 21, 2024, and on or about December 5, 2025, in Palm Beach County, in the Southern District of Florida, and elsewhere, Nika Machutadze ("MACHUTADZE") violated Title 18, United States Code, Section 1956(h), that is, did conspire or attempt to conspire with one or more persons to knowingly conduct financial transactions affecting interstate and foreign commerce, which financial transactions involved the proceeds of specified unlawful activity, knowing the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and to knowingly engage or attempt to engage in a monetary transaction, of a value greater than $10,000, knowing that the transaction involved criminally derived property, and which in fact was derived from a specified unlawful activity, in violation of 18 U.S.C. § 1957(a). There further is probable cause to believe that the specified unlawful activity is health care fraud, in violation of Title 18, United States Code, Section 1347.

5.      The information and statements contained in this affidavit are based upon my personal knowledge and investigation, as well as documents and information provided to me by other law enforcement personnel and witnesses. Since this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not included each and every fact known to me concerning this investigation. All figures, times, and calculations set forth in this affidavit are approximate.

**PROBABLE CAUSE**

*Summary of Criminal Conduct*

6.      The government's investigation has revealed that MACHUTADZE has at various times between November 21, 2024 and at least December 5, 2025, served as the registered owner for two durable medical equipment ("DME")[1] companies—DME Company 1 and Centurion Superior Medical, LLC ("CENTURION"). These two companies fraudulently billed Medicare, Medicare Supplemental Insurance ("Medigap"), and the Federal Employees Health Benefits Program ("FEHBP") billions of dollars for orthotic braces, continuous glucose monitors, urinary catheters, and wound dressings[2] that beneficiaries did not need and did not receive.

7.      Ownership documents for DME Company 1, based in the Southern District of Florida, show that MACHUTADZE is the former registered owner of DME Company 1. Although DME Company 1 is now purportedly under the control of MACHUTADZE's co-conspirator, Co-Conspirator 3, MACHUTADZE remains the listed control person for DME Company 1's Medicare claims submission platform, and continues to hold himself out as the owner of DME Company 1. Bank records confirm that at least $4,352,514.99 in payments from Medicare, Medigap, and/or FEHBP insurers has been deposited by paper check into DME Company 1's accounts, over which Co-Conspirator 3 is the sole signatory. The bank accounts reviewed to date contain no activity consistent with a legitimate medical business, such as payments to stock

---

[1] DME is equipment that is designed for repeated use and for a medical purpose, such as orthotic braces and continuous glucose monitors.

[2] Wound dressings include alginate dressings intended to absorb exudate from wounds and promote tissue regeneration.

medical products that DME Company 1 supposedly provides to beneficiaries. Instead, the bank accounts show that Co-Conspirator 3 and/or MACHUTADZE frequently transfer large sums of money between DME Company 1's accounts and to foreign entities. In total, at least $4,351,302.09 has been transferred from DME Company 1's accounts to entities overseas in Hong Kong and China.

8.     Ownership documents for CENTURION show that MACHUTADZE is the current registered owner of CENTURION. Bank records confirm that at least $993,351.96 in payments from Medicare, Medigap, and/or FEHBP insurers has been deposited by paper check into CENTURION's accounts, over which MACHUTADZE is the sole signatory. The bank accounts reviewed to date contain no activity consistent with a legitimate medical business, such as payments to stock medical products that CENTURION supposedly provides to beneficiaries. Instead, bank records show that MACHUTADZE transferred at least $988,830.10 out of CENTURION's accounts to an entity located in Hong Kong.

### *The Medicare Program*

9.     The Medicare Program ("Medicare") is a federally funded health care program that provides free or below-cost health care benefits to individuals who are sixty-five years of age or older or disabled. The benefits available under Medicare are governed by federal statutes and regulations. The United States Department of Health and Human Services, through its agency, the Center for Medicare and Medicaid Services ("CMS"), oversees and administers Medicare. Individuals who receive benefits under Medicare are commonly referred to as "beneficiaries."

10.     Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

11.     Medicare is subdivided into multiple program "parts." Medicare Part B covers physician services and outpatient care, including an individual's access to DME and wound dressings.

12.     To participate in Medicare, providers, including DME companies, are required to submit an enrollment application. As set out in the application, every provider is required to meet certain standards to obtain and retain billing privileges to Medicare, including: (1) provide complete and accurate information on the application, with any changes to the information on the application reported within 30 days; (2) disclose persons and/or organizations with ownership interests or managing control; (3) abide by applicable Medicare laws, regulations, and program instructions; (4) acknowledge that the payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions; and (5) refrain from knowingly presenting or causing to be presented a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity.

13.     Upon a change in ownership to an enrolled Medicare provider, the provider is required to re-submit an enrollment application setting forth details of the new ownership, including the names of all owners and managing employees, contact information, and a certification by any new individuals that they will abide by Medicare rules and regulations. The enrollment application must be approved by Medicare before the provider can be reimbursed for claims following a change in ownership.

14.     Under Medicare Part B, DME and wound dressings are required to be reasonable and medically necessary for the treatment or diagnosis of the beneficiary's illness or injury,

ordered by a medical professional, properly documented, and provided as represented to Medicare.

15.     To receive payment from Medicare, DME companies are required to submit a health insurance claim form, known as a CMS-1500. The CMS-1500 requires DME companies to provide certain important information, including: (a) the Medicare beneficiary's name and unique Medicare identification number; (b) the unique physician identification number of the doctor or other qualified health care provider who ordered the health care benefit, item, or service that was the subject of the claim; (c) the health care benefit, item, or service that was provided or supplied to the beneficiary; (d) the billing codes for the benefit, item, or service; and (e) the date upon which the benefit, item, or service was provided to or supplied to the beneficiary.

16.     Medigap helps fill "gaps" of Medicare coverage and is sold by private health insurance companies. A Medigap plan can help pay some of the remaining health care costs not covered by Medicare, such as copayments, coinsurance, and deductibles. For DME claims, a Medigap plan generally covers approximately 20% of the claim amount. Medicare Supplemental Insurers are contractually obligated to reimburse claims that are processed by Medicare, even if Medicare has subsequently suspended payment of the claims.

### *The Federal Employees Program*

17.     The FEHBP is a federally funded health benefit program for federal employees, retirees, and their eligible spouses and dependent children. The U.S. Office of Personnel Management ("OPM") administers the FEHBP. Payroll offices from all federal agencies collect health insurance premiums and forward the money to OPM's revolving trust account maintained at the U.S. Treasury. OPM contracts with numerous health insurance plans. These insurance plans process and pay health care claims on behalf of the FEHBP. OPM reimburses the contracted health

insurance plans for 100% of the health care claims they pay, and 100% of their administrative expenses, plus a negotiated service charge.

18.    The FEHBP is a "health care benefit program" as defined by 18 U.S.C. § 24(b).

### The Defendant and Relevant Entities

19.    MACHUTADZE is a Russian citizen who has been residing in Austin, Texas. On or about January 29, 2026, law enforcement learned that a flight was purchased for MACHUTADZE to fly from Mexico to Spain, ultimately bound for the United Arab Emirates.

20.    DME Company 1 is a DME company formed under the laws of Florida with its principal place of business located in Palm Beach County, in the Southern District of Florida.

21.    Owner 1 was listed with the Florida Department of State as the authorized member of DME Company 1 at the time of its formation on April 15, 2020.

22.    Co-Conspirator 1 is believed to be operating under an alias and his/her true identity is unknown. Co-Conspirator 1 coordinated the purchase of DME Company 1 from Owner 1, on behalf of Co-Conspirator 2 and MACHUTADZE.

23.    Co-Conspirator 2 is a Georgian citizen whose current residence is unknown.

24.    Co-Conspirator 3 is a United States citizen with a primary residence in Miami, Florida. Co-Conspirator 3 is currently listed with the Florida Department of State as the sole authorized member of DME Company 1.

25.    CENTURION is a DME company formed under the laws of Texas with its principal place of business located in the Western District of Texas, at 11211 Taylor Draper Lane, Suite 9, Austin, Texas 78759.

26.    On or around October 25, 2023, CENTURION was formed under the laws of Texas

with Owner 2 listed as the sole managing member of CENTURION.

27.    On or around September 12, 2025, a Certificate of Amendment was filed with the Texas Department of State removing Owner 2 as CENTURION's managing member and adding MACHUTADZE as the sole managing member.

28.    Although Co-Conspirator 3 is the sole authorized member of DME Company 1 in the Florida Department of State's records, records obtained from CMS confirm that neither MACHUTADZE nor Co-Conspirator 3 has ever been identified to CMS as an owner or manager of DME Company 1. Instead, Owner 1 remains the sole owner and manager associated with DME Company 1's CMS registration.

29.    Likewise, although MACHUTADZE is the sole managing member of CENTURION in the Texas Department of State's records, records obtained from CMS confirm that MACHUTADZE has never been identified to CMS as an owner or manager of CENTURION. Instead, Owner 2 remains the sole owner and manager associated with CENTURION's CMS registration.

### *The Underlying Health Care Fraud*

*The Sale of DME Company 1 to MACHUTADZE*

30.    Owner 1 was listed as the authorized member of DME Company 1 beginning in April 2020.[3]

---

[3] Owner 1 was in a relationship with Victor Van Vickery, who was one of DME Company 1's true owners from April 2020 through in or around 2023. Vickery pled guilty to conspiring to commit health care fraud in or around November 2023 involving DME Company 1 and other companies. *United States v. Victor Van Vickery*, 23-cr-80140-RLR. Robert Smith was also a beneficial owner

31.     On March 12, 2025, law enforcement interviewed Owner 1. Owner 1 stated that s/he sold or attempted to sell DME Company 1 to third parties throughout 2023 and 2024, which resulted in changes in its corporate ownership. S/he ultimately reached an agreement to sell the business in or around July or September 2024 to Co-Conspirator 2. Owner 1 never met Co-Conspirator 2; s/he only spoke to Co-Conspirator 2's purported assistant, Co-Conspirator 1.

32.     Owner 1 provided the sales contract and emails regarding the sale of DME Company 1 to MACHUTADZE. In an email dated November 15, 2024, Co-Conspirator 2 wrote to Owner 1 stating that he had asked his "partner" to take over the purchase of DME Company 1, and that Co-Conspirator 1 would coordinate the final steps of the sale. On November 22, 2024, Co-Conspirator 1 emailed Owner 1 sale documentation for DME Company 1, signed by MACHUTADZE, and requesting that Owner 1 finalize the proper ownership with the Florida Secretary of State. The purchase agreement for the sale of DME Company 1 was executed on November 21, 2024, and listed Owner 1 as the seller and MACHUTADZE as the buyer.

33.     Consistent with Owner 1's documents, on November 25, 2025, an amendment was filed with the Florida Department of State removing Owner 1 as DME Company 1's authorized member and adding MACHUTADZE as DME Company 1's authorized member.

34.     Two weeks later, on December 6, 2024, another amendment was filed with the Florida Department of State removing MACHUTADZE as DME Company 1's authorized member and adding Co-Conspirator 3 as DME Company 1's authorized member.

---

of DME Company 1 during this time frame and also pled guilty to the same conspiracy. *United States v. Smith*, 23-cr-80211-KAM. Owner 1 has not been charged.

35.     Although Co-Conspirator 3 is to date the sole authorized member of DME Company 1 in Florida Department of State records, MACHUTADZE continues to hold himself out as an owner or manager of DME Company 1. Financial records obtained in the course of this investigation reflect that as recently as August 21, 2025, MACHUTADZE identified himself in account opening paperwork for a personal checking account as employed by DME Company 1, with a role of "managing member."

36.     Law enforcement obtained records from Billing Company 1, an electronic claims submission platform, pursuant to grand jury subpoena. These records show that MACHUTADZE opened an account with Billing Company 1 for DME Company 1 on November 22, 2025, and has at all times since that date been the owner of DME Company 1's account. Account access records provided by Billing Company 1 further show that MACHUTADZE's account username continued to access DME Company 1's account at least through July 30, 2025, eight months after DME Company 1 was publicly transferred to Co-Conspirator 3. Billing records provided by Billing Company 1 confirm that their claims submission platform has been used by DME Company 1 to submit thousands of false and fraudulent claims to Medicare.

*Beneficiary Complaints and Interviews*

37.     HHS-OIG and OPM-OIG have received thousands of complaints from beneficiaries regarding DME Company 1 and CENTURION submitting fraudulent claims.

DME Company 1

38.     On or about December 31, 2024, DME Company 1 billed Medicare approximately $5,130 for orthotic braces purportedly provided to Beneficiary 1. On March 24, 2025, Beneficiary 1 was interviewed and told law enforcement that s/he filed a complaint with HHS-OIG.

Beneficiary 1 had never heard of the referring provider for the DME claims for which his/her Medicare plan was billed. Furthermore, Beneficiary 1 believes these charges were fraud and never received any of the DME from DME Company 1. Beneficiary 1 never gave anyone his/her Medicare number and has no pain in his/her knees, back, or wrists that would warrant the braces for which DME Company 1 billed.

39.     On or about December 19, 2024, DME Company 1 billed Medicare approximately $1,524 for diabetic equipment purportedly provided to Beneficiary 2. On April 3, 2025, Beneficiary 2 was interviewed and told law enforcement that s/he reported the charges from DME Company 1 to his/her supplemental insurer as fraud. Beneficiary 2 does not know the referring provider on the DME Company 1 claim and had not heard of DME Company 1.

40.     On or about March 24, 2025, DME Company 1 billed Medicare approximately $2,580 for gel wound dressings purportedly provided to Beneficiary 3. On May 7, 2025, Beneficiary 3 was interviewed and told law enforcement that a complaint was filed with HHS-OIG on his/her behalf. Beneficiary 3 became aware of the wound dressing charges by DME Company 1 through his/her supplemental insurance. Beneficiary 3 has never been treated for any severe burns or wounds that required wound dressings nor was he/she ever prescribed wound dressings.

<u>CENTURION</u>

41.     On or about September 26, 2025, CENTURION billed Medicare (Beneficiary 4's primary insurer) and the FEHBP (Beneficiary 4's supplemental insurer) $2,662.36 for a back brace and two wrist braces purportedly provided to Beneficiary 4. On November 19, 2025, law enforcement interviewed Beneficiary 4 and Beneficiary 4's primary caregiver and was told that

s/he had not received any braces from CENTURION, and had no need for wrist or back braces in or around September 2025. Beneficiary 4 had never heard of CENTURION, and had never given CENTURION approval to bill his/her Medicare or FEHBP plans for braces. Furthermore, Beneficiary 4 informed law enforcement that s/he could not walk, and therefore would have no ability to use a back brace if prescribed.

42.     On or about September 25, 2025, CENTURION billed Medicare (Beneficiary 5's primary insurer) and the FEHBP (Beneficiary 5's supplemental insurer) $2,662.36 for a back brace and two wrist braces purportedly provided to Beneficiary 5.[4] On November 20, 2025, law enforcement interviewed Beneficiary 5, who stated that s/he had never received or been prescribed any back or wrist braces, and had never heard of CENTURION or the purported prescribing physician. Beneficiary 5 informed law enforcement that s/he had no need for braces because s/he was in perfect health. Beneficiary 5 reported all claims from CENTURION to his/her FEHBP plan and Medicare as fraud.

43.     On or about October 9, 2025, CENTURION billed Medicare (Beneficiary 6's primary insurer) and the FEHBP (Beneficiary 6's supplemental insurer) $3,480.00 for two intermittent urinary catheters (and associated supplies) purportedly provided to Beneficiary 6. On January 27, 2026, law enforcement interviewed Beneficiary 6, who stated that s/he had never used a catheter and had no need for a catheter. Beneficiary 6 stated that s/he had never heard of

---

[4] CENTURION in fact billed Beneficiary 5's FEHBP plan twice for these claims, for a total crossover claim of $5,324.72.

CENTURION, and had received no medical equipment s/he did not recognize from CENTURION or any other providers.

*Physician and Medical Practice Interviews*

<u>DME Company 1</u>

44.    A review of the Medicare billing data shows that, in or around February 2025, DME Company 1 submitted approximately 585 claims for which Physician 1 was the referring provider relating to approximately 116 beneficiaries. These claims resulted in approximately $600,210 being billed to Medicare, of which Medicare processed $249,607 as paid. On April 2, 2025, Physician 1 was interviewed and told law enforcement that s/he filed a complaint with HHS-OIG. Physician 1 started receiving patient complaints from individuals who s/he never saw or met. These patients were not patients of Physician 1. The patients were complaining to Physician 1 because s/he was listed as the referring provider on DME Company 1's claims billed to Medicare on behalf of the patients. Physician 1 reported that s/he rarely prescribes orthotic braces. Physician 1 stated that s/he had never heard of DME Company 1 prior to the patient complaints and never authorized or approved DME Company 1 to use his/her NPI. It appeared to Physician 1 that all the patients were billed for the same products.

45.    A review of the Medicare billing data shows that, in or around January 2025, DME Company 1 submitted approximately 660 claims for which Physician 2 was the referring provider relating to approximately 120 beneficiaries. These claims resulted in approximately $281,900 being billed to Medicare, of which Medicare processed approximately $171,195 as paid. On April 2, 2025, Physician 2's office manager was interviewed after filing a complaint with HHS-OIG on behalf of Physician 2. The office manager became aware of DME Company 1 using Physician 2

as a referring provider without approval through a patient complaint. The office manager has received multiple patient complaints in which the patients were billed for DME that they did not receive and for which Physician 2 did not consult them. Some of the patients were already established patients of Physician 2's medical office. The supporting documentation of the patient complaints the office manager has reviewed were related to continuous glucose monitors. Physician 2's medical office has seen diabetic patients but works with other vendors, not DME Company 1, when those patients need supplies. Physician 2 did not prescribe or authorize any of the products that DME Company 1 billed to Medicare as referred by Physician 2.

<u>CENTURION</u>

46.    A review of the Medicare billing data shows that, between September 25, 2025, and October 28, 2025, CENTURION submitted approximately 436 claims for which Physician 3 was the referring provider relating to approximately 109 beneficiaries. Three of these claims were for wrist and back braces, and the remaining 433 were for intermittent urinary catheters and insertion supplies. These claims resulted in approximately $756,082.36 being billed to Medicare, of which Medicare processed $443,996.22 as paid. On December 18, 2025, Physician 3 was interviewed by law enforcement and stated that s/he ran a family practice in Maryland, had never heard of CENTURION, and could not recall having ever referred patients to a DME provider in Texas. Physician 3 stated that s/he could not recall having ever referred patients for intermittent urinary catheters, and had never referred a large number of patients to receive intermittent urinary catheters at one time.

*Analysis of Claims Data*

47.     An analysis of the billing data shows that DME Company 1 started submitting large numbers of claims on December 19, 2024, shortly after DME Company 1 was purchased by MACHUTADZE and transferred to Co-Conspirator 3. Many of these claims were backdated to reflect dates of service months prior to their submission. In total, from on or about December 19, 2024, through the present, DME Company 1 submitted claims for 1,639,690 items of DME purportedly prescribed to 221,514 beneficiaries across the United States. Medicare was billed $3,337,933,746 for these claims, of which approximately $1,780,541,732 was processed as paid. The billing targeted particular high-value products and billing codes. Specifically, DME Company 1 billed Medicare for 238,703 continuous glucose monitors, 752,281 intermittent urinary catheters, 297,089 alginate wound dressings, and 290,090 orthotic braces. At least 330 items of DME were purportedly prescribed to beneficiaries who were deceased as of the alleged date of service.

48.     Likewise, the billing data shows that CENTURION began submitting large numbers of claims to Medicare on September 25, 2025, shortly after MACHUTADZE became the owner and operator of CENTURION. Many of these claims were backdated to reflect dates of service months prior to their submission. In total, from September 25, 2025, through October 28, 2025, CENTURION submitted claims for 78,663 items of DME purportedly prescribed to approximately 24,060 beneficiaries across the United States. Medicare was billed $134,310,760 for these claims, of which $90,283,331 was processed as paid. The billing targeted particular high-value products and billing codes. Specifically, CENTURION billed Medicare for 3,000 orthotic

braces—wrist and back, with every associated beneficiary receiving *both* a left and right wrist brace, *and* a back brace—and 75,663 intermittent urinary catheters with insertion supplies.

49.     In my training and experience, the billing data for DME Company 1 and CENTURION display many indicators that DME Company 1 and CENTURION are engaged in fraud. Specifically, (1) rapid spikes in billing, (2) billing exclusively (or almost exclusively) for high dollar value DME, (3) billing every beneficiary for the same items of DME and/or multiple items of DME that could not reasonably be used together, and (4) repeated billing of items to dead beneficiaries, are each indicators that an entity is fraudulently billing for items that are medically unnecessary and/or not actually provided to beneficiaries as billed.

50.     Although Medicare initially processed these claims for reimbursement to DME Company 1 and CENTURION, on December 26, 2024, Medicare began suspending payments to DME Company 1. Likewise, on October 2, 2025, Medicare began suspending payments to CENTURION. From these dates forward, Medicare processed incoming claims from each company for payment, but stopped outgoing payments and suspended all claims reimbursement before Medicare funds were actually disbursed to DME Company 1 or CENTURION.

51.     However, Medigap Supplemental Insurers, as a result of these processed claims, continued to issue reimbursements to DME Company 1 and CENTURION. Hundreds of checks from Medigap Supplemental Insurers therefore continued to be issued to DME Company 1 and CENTURION and deposited into each company's financial accounts. These deposits took place after MACHUTADZE's purchase of DME Company 1 and/or CENTURION, respectively.

16

### *Evidence of Money Laundering*

<u>DME Company 1</u>

52.     DME Company 1 maintained accounts with at least five different banks between December 2024 and the present. The investigative team subpoenaed and analyzed DME Company 1's bank records.

53.     A review of DME Company 1's financial records obtained via grand jury subpoena did not reveal financial activity consistent with the running of a large-scale DME or wound care business. For example, a detailed review was unable to identify consistent expenses tied to business activities typically expected with the operation of a DME business, such as purchases of orthotic braces, catheters, diabetic supplies, or wound supplies, shipping and packaging fees, and/or storage fees.[5]  Rather, the accounts appeared to have been used almost exclusively for the deposit of insurance proceeds and the transfer of those proceeds to foreign entities or to members of the conspiracy.

54.     On or about December 4, 2024, MACHUTADZE opened a bank account ending in x3754 at Bank 1, at a branch located in Palm Beach County, Florida, in the name of DME

---

[5] The only expenses that appeared to be medically related were payments to pVerify. pVerify is an insurance eligibility platform that is used to verify a patient's insurance coverage. From my training and experience, I know that individuals participating in health care fraud use eligibility tools to determine what insurance plans to target and avoid detection and denials. According to bank records obtained pursuant to grand jury subpoena, payments to pVerify were issued from accounts in the name of DME Company 1 over which MACHUTADZE and/or Co-Conspirator 3 have at all times been the sole signatories. In response to a grand jury subpoena, pVerify confirmed that the account was opened in the name of Owner 1 and has not been transferred to MACHUTADZE or Co-Conspirator 3.

Company 1 ("Account 1"). On or about December 11, 2024, the signature card for Account 1 was updated. MACHUTADZE was removed and Co-Conspirator 3 was added as the sole signatory. Since this time, Co-Conspirator 3 has been the only listed authorized signer for Account 1.

55.    After DME Company 1 received payments from insurers, the proceeds were typically quickly withdrawn. Some of these withdrawn funds were sent directly to foreign bank accounts. For example, on January 8, 2025, the starting balance for Account 1 was $780.70. Between January 8, 2025, and March 17, 2025, the account received approximately $326,389.93 in insurance proceeds and no other deposits. On February 18, 2025, approximately $55,020.00 was wired from the account to a shell company based in Hong Kong. On February 24, 2025, approximately $56,089.60 was wired from the account to the same foreign entity. On March 17, 2025, approximately $61,001.60 was wired from the account to the same foreign entity by Co-Conspirator 3, in person, in a Bank 1 branch in the Southern District of Florida. Each of these transactions is an example of money laundering—namely, a monetary transaction in criminally derived property of a value greater than $10,000.

56.    By opening and administering Account 1 in their names, MACHUTADZE and Co-Conspirator 3 attempted to conceal the involvement of their co-conspirators, including Co-Conspirators 1 and 2. Likewise, by wiring fraudulent insurance proceeds to the Hong Kong shell company without any discernable legitimate business purpose, Co-Conspirator 3 endeavored to conceal or disguise the nature, location, source, ownership, and/or the control of the proceeds.

<u>CENTURION</u>

57.     CENTURION maintained accounts with at least six different banks between September 2025 and the present. The investigative team subpoenaed and analyzed CENTURION's bank records.

58.     As with DME Company 1, a review of CENTURION's financial records obtained via grand jury subpoena did not reveal financial activity consistent with the running of a large-scale DME or wound care business. For example, a detailed review was unable to identify consistent expenses tied to business activities typically expected with the operation of a DME business, such as purchases of orthotic braces or catheters, shipping and packaging fees, and/or storage fees.[6] Rather, the accounts appeared to have been used almost exclusively for the deposit of insurance proceeds and the transfer of those proceeds to foreign entities or to members of the conspiracy.

59.     On or about December 4, 2025, MACHUTADZE opened a bank account ending in x9099 at Bank 2, at a branch located in Travis County, Texas, in the name of CENTURION ("Account 2"). In account opening paperwork, MACHUTADZE identified himself as the sole owner of CENTURION. Since this time, MACHUTADZE has been the only listed authorized signer for Account 2.

---

[6] The only expenses that appeared to be medically related were payments to Billing Company 1. As set forth above, Billing Company 1 is an electronic claims submission platform used by health care providers to submit claims to Medicare, and the same claims submission platform used by DME Company 1.

60.      On or about November 9, 2023, Owner 2 opened a bank account ending x0779 at Bank 3, at a branch located in Broward County, Florida, in the name of CENTURION ("Account 3"). On September 17, 2025, the signature card for Account 3 was updated to remove Owner 2 and list MACHUTADZE as the managing member of CENTURION and sole authorized signer on the account. Since that time, MACHUTADZE has been the only listed authorized signer for Account 3.

61.      On or about September 18, 2025, MACHUTADZE opened a bank account ending in x5558 at Bank 4, at a branch located in Travis County, Texas, in the name of CENTURION ("Account 4"). In account opening paperwork, MACHUTADZE identified himself as the managing member of CENTURION. Since this time MACHUTADZE has been the only listed authorized signer for Account 4.

62.      As with DME Company 1, after CENTURION received payments from insurers, the proceeds were typically quickly withdrawn. Some of these withdrawn funds were sent directly to foreign bank accounts, including, as with DME Company 1, foreign bank accounts in Hong Kong. For example, on October 1, 2025, the starting balance for Account 2 was $162.25. Between October 1, 2025, and November 28, 2025, the account received approximately $826,222.82 in insurance proceeds and no other deposits.[7] On November 12, 2025, approximately $48,510.00

---

[7] While the majority of these deposits were directly from insurers, approximately $205,009.00 of these proceeds were transferred from Account 3, which was almost exclusively (99.8%) funded by insurance proceeds. On October 2, 2025, following MACHUTADZE's acquisition of the account, the starting balance for Account 3 was $168.14. Between October 1, 2025, and November 25, 2025, the account received approximately $445,932.97 in insurance proceeds, approximately $1,200.00 in cash, and no additional deposits. On November 10, 2025, MACHUTADZE withdrew

was wired from the account to a shell company based in Hong Kong. On November 13, 2025, approximately $78,160.20 was wired from the account to the same shell company. On November 14, 2025, approximately $92,001.45 was wired from the account to the same shell company. Similar wires ranging from $52,457.00 to $98,185.00 were made on November 18, November 21, November 24, November 26, and November 28, 2025. Each of these transactions is an example of money laundering—namely, a monetary transaction in criminally derived property of a value greater than $10,000.

63.    By opening and administering Account 2 in his name, and by identifying himself as the sole owner of CENTURION, MACHUTADZE attempted to conceal the involvement of his co-conspirators. Likewise, by wiring fraudulent insurance proceeds to the Hong Kong shell company without any discernable legitimate business purpose, MACHUTADZE endeavored to conceal or disguise the nature, location, source, ownership, and/or the control of the proceeds.

64.    Similarly, on November 1, 2025, the starting balance for Account 4 was $147.77. Between November 1, 2025, and November 28, 2025, the account received approximately $119,028.67 in insurance proceeds and no other deposits. On November 2, 2025, approximately $75,031.00 was wired from the account to the same foreign entity receiving proceeds from

---

$42,500.00 by check from Account 3, and deposited that check into Account 2. On November 13, 2025, MACHUTADZE withdrew $49,500.00 by check from Account 3, and deposited that check into Account 2. On November 17, 2025, MACHUTADZE withdrew $47,700.00 from Account 3, and deposited that check into Account 2. On November 25, 2025, MACHUTADZE withdrew $65,309.00 by check from Account 3, and deposited that check into Account 2.

Account 2. This transaction is an example of money laundering—namely, a monetary transaction in criminally derived property of a value greater than $10,000.

65.     By opening and administering Account 4 in his name, and by identifying himself as the managing member of CENTURION, MACHUTADZE attempted to conceal the involvement of his co-conspirators. Likewise, by wiring fraudulent insurance proceeds to the Hong Kong shell company without any discernable legitimate business purpose, MACHUTADZE endeavored to conceal or disguise the nature, location, source, ownership, and/or the control of the proceeds.

### *Surveillance and Location Data*

66.     On December 29, 2025, law enforcement conducted surveillance of MACHUTADZE's residence, located in Travis County, Texas. Law enforcement observed MACHUTADZE exit his residence and drive directly to a Pak Mail location, and then a Bank 2 location.

67.     Account access records provided by Bank 3 show that from September 17, 2025, through at least December 16, 2025, Account 3 was controlled by user "boog3yman20," whose listed address matches the address for MACHUTADZE's residence. Location data provided in the Bank 3 access logs records that on multiple occasions, "boog3yman20" accessed Account 3 from the approximate location of MACHUTADZE's residence. These recorded occasions span the same period of time—beginning October 2, 2025, and continuing through December 4, 2025— during which approximately $445,932.97 in health care fraud proceeds were deposited into Account 3, approximately $205,009.00 of which were rapidly transferred to Account 2 and then to a foreign entity based in Hong Kong.

68.     Surveillance images obtained from Bank 4 depict MACHUTADZE transacting in Account 4 in person in the Western District of Texas as recently as January 2026.

69.     Surveillance images obtained from Bank 5 depict MACHUTADZE entering a Bank 5 branch in the Western District of Texas on September 24, 2025, the same day that a Bank 5 account was opened for CENTURION listing MACHUTADZE as the account owner.

## CONCLUSION

70.     Based on the facts set forth above, I respectfully submit that probable cause exists to believe that, between on or about November 21, 2024, and on or about December 5, 2025, in Palm Beach County, in the Southern District of Florida, and elsewhere, MACHUTADZE did conspire or attempt to conspire to commit money laundering in violation of 18 U.S.C. § 1956(h).

FURTHER AFFIANT SAYETH NAUGHT.


Respectfully submitted,


NAIN NAYOR
SPECIAL AGENT
OFFICE OF PERSONNEL MANAGEMENT
OFFICE OF THE INSPECTOR GENERAL


Sworn to and attested by Telephone-Facetime
per Fed. Crim. P. 4(d) and 4.1 on ____ day of January 2026

Digitally signed by
Bruce Reinhart
Date: 2026.01.30
12:33:14 -05'00'

Bruce Reinhart

_____
HONORABLE BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE

AO 442 (Rev. 01/09) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) | Case No.    26-mj-8086-BER |
| NIKA MACHUTADZE, | ) | |
| *Defendant.* | ) | |

Type text here

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*   Nika Machutadze                                                                   ,

who is accused of an offense or violation based on the following document filed with the court:

❑ Indictment     ❑ Superseding Indictment     ❑ Information     ❑ Superseding Information     ☑ Complaint
❑ Probation Violation Petition     ❑ Supervised Release Violation Petition     ❑ Violation Notice     ❑ Order of the Court

This offense is briefly described as follows:

Conspiracy to commit money laundering (18 U.S.C. 1956(h))

Certified to be a true and correct copy of the document on file
Angela E. Noble, Clerk,
U.S. District Court
Southern District of Florida
By TANYA MCCLENDON
Deputy Clerk
Date Jan 30, 2026

**Bruce Reinhart**

Digitally signed by Bruce Reinhart
Date: 2026.01.30
12:33:31 -05'00'

Date:   01/30/2026

*Issuing officer's signature*

City and state:    West Palm Beach, Florida

Bruce E. Reinhart, U.S. Magistrate Judge

*Printed name and title*

| **Return** |
|---|
| This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____ at *(city and state)* _____. |
| Date: _____                                   _____ *Arresting officer's signature* |
| _____ *Printed name and title* |